Murder in the second degree; fifteen years.
Appellant was indicted for the January 9, 1979, unlawful killing of his wife by shooting her with a pistol. He pleaded not guilty to the charge and later amended his plea to not guilty by reason of insanity. The jury found appellant guilty of second degree murder and the trial court set sentence in accordance with the jury's verdict.
The evidence presented by the State showed the following:
Mrs. Fay Howell testified that appellant and his wife had been her next-door neighbors for eight years. She stated that approximately 1:30 P.M. on January 9, 1979, appellant "came running into my house and was, you know, real upset and said he had killed his baby and then he changed it. He said, `Lou's killed herself. She said she didn't want to live any more. Come help me.'" Appellant told Mrs. Howell not to call his son because "he'll think I did it and he'll kill me."
On cross-examination, Mrs. Howell testified that appellant had a good reputation in the community, that he was truthful, hardworking, peaceful and law-abiding. Mrs. Howell was aware appellant and his wife were having domestic problems prior to the incident in question and that a divorce suit was pending.
Lane Winfield, a paramedic with the Prichard Fire Department, testified that he arrived at appellant's residence and found the deceased lying in the front yard on her stomach. Mr. Winfield stated that his examination of the deceased revealed no pulse or respiration.
John D. Powell of the Prichard Police Department testified that he went to appellant's residence on the date in question and observed the deceased lying in the yard and the appellant walking around wringing his hands saying, "My baby's been shot."
In response to Officer Powell's questions, appellant said that his wife, "had shot herself," *Page 1083 
and he led Officer Powell to the gun at the end of the kitchen table. Officer Powell stated that he did not see any blood or signs of a struggle near the gun. Appellant stated that his wife had the gun for protection. Appellant was placed under arrest and taken to the police station.
On cross-examination, Powell testified that he had known appellant for twenty years and that appellant had a good reputation in the community.
Detective Frank Dees of the Prichard Police Department testified that he received a .22 caliber pistol at the scene and took it, along with the deceased's clothing, to the toxicologist. Detective Dees stated that the pistol contained three or four spent shells and one or two live rounds. It was stipulated that Mrs. Crumpton's death was caused by a gunshot wound which entered her lung. It was further stipulated that the deceased was shot three times, twice in the arm and once in the back of the shoulder. The fatal bullet traveled through the deceased's arm and into her lungs.
Ms. Althea Lewis testified that she was friends with appellant and his wife and had known them for approximately ten years. Ms. Lewis recalled that in a conversation she had with appellant during the first part of January, 1979, appellant told her that he and his wife were going to have to go to court and he "didn't feel that it was right for him to have to move out and give up everything that he owned, you know, and worked for, and before he would do that, that he would kill Lou. . . ."
On cross-examination, Ms. Lewis stated that when appellant said he would "kill her (Lou) first," it did not sound like him and she "didn't think he would do it."
Ms. Inez Crumpton, a sister of the deceased, testified that she was aware that the deceased had initiated a divorce proceeding against appellant. Ms. Crumpton stated that in a telephone conversation with appellant two or three months prior to the shooting, appellant told her the deceased "would die before he moved out of the house." Ms. Crumpton stated that she did not believe appellant at the time.
Detective J.R. Rigby of the Prichard Police Department, talked with appellant at the police station. Appellant was given his Miranda warnings and voluntarily signed a waiver and made a statement. In the statement appellant adhered to his story that the deceased "shot herself."
On cross-examination, Detective Rigby stated that he found appellant's house orderly. There did not "appear to have been any big fight going on in the place."
Richard D. Carter, a Firearms Examiner with the Department of Forensic Sciences, verified that the .22 caliber pistol recovered from the scene was the weapon that fired the fatal shot which struck the deceased. The deceased's robe, which contained three bullet holes, was also introduced. Mr. Carter said that in his opinion the revolver was fired from a distance of one-half inch, two inches and twelve inches, respectively, for the three gunshot wounds.
At the conclusion of Mr. Carter's testimony the State rested its case. The defense motion to exclude the State's evidence was denied and the defense presented its case.
Appellant testified in his own behalf that he and the deceased were married in June, 1960. He stated that the deceased had filed for a divorce in the latter part of 1978, and that he "didn't want one." Appellant stated that after the divorce proceedings were filed, he was of the impression "good progress" was being made towards a reconciliation. On the Saturday before the shooting appellant said that he and his wife "went out to a steak house and had supper and then we went clubbing until 2:00 o'clock in the morning." The following day he and the deceased went to his sister's house and "told her everything was going to be all right."
On the day of the shooting appellant testified that he got up around 11:00 A.M. The deceased had "gotten up around 7:00" A.M., left the house, and had come back about 11:30 A.M.
Appellant testified that while the deceased was fixing his lunch, she started an *Page 1084 
argument which lasted one and a half or two hours. The deceased told appellant, "I'm doing what I want to do. You always accused me of things so I'm just telling you I'm doing them now. . . . If you don't like it you can just kill me." Appellant stated that the deceased had been involved with several men during the last four or five years. "One time I caught her with one man, and, you know, actually caught her in there." Appellant testified that his wife's involvement with other men had been a constant source of friction between them. He stated that her past encounters were "all brought up" when the two were arguing. The last thing appellant remembered clearly before the shooting occurred was the deceased's telling him "it wasn't any of my business even if she decided she wanted to go with a nigger."
When questioned about his pending divorce from the deceased, appellant stated that his wife's filing for exclusive possession of their house "didn't make me mad, it just didn't help my feelings." Appellant testified that he could not remember telling Inez Crumpton he would have the deceased "dead" before she put him out of the house. Appellant also denied ever telling Althea Lewis he would "kill Lou before she makes me get out of that house."
However, appellant did testify that if he told Mrs. Howell, "I shot my baby, I killed my baby, Lou shot herself" then, "I said it." Appellant stated that he remembered very little about the incident, but did remember some people coming to the scene.
Appellant denied shooting the deceased. He said that he told "the truth" to Dr. Brown, a psychiatrist whom he consulted on the recommendation of his attorney after being charged with murder. He thought he told Dr. Brown that the deceased shot herself. "I don't remember if she shot herself, but I say she shot herself. I don't feel responsible."
Ms. Kay Phillips, appellant's sister, testified that she talked with the deceased on the Sunday night before she died and was of the opinion appellant and the deceased were getting back together. Ms. Phillips testified that appellant loved the deceased and was dependent on her.
Vincent P. Bitowf, appellant's former supervisor at the Alabama Shipbuilding and Dry Dock Company, testified that he knew appellant very well and "found him to be a very humble man, a hard working man." He stated that appellant had a good reputation and was truthful.
Daniel J. Maloney, also a co-worker of appellant, testified that he had known appellant at the Alabama Dry Dock since 1946, and that appellant's reputation was very good. Mr. Malone knew appellant to be truthful and "absolutely nonviolent."
Charles E. Gunter, appellant's immediate supervisor, testified that he had known appellant approximately thirty years. Mr. Gunter stated that appellant had a good reputation and was truthful.
Dr. Claude L. Brown testified that he saw appellant in his office twice after the shooting. Appellant told Dr. Brown that his marriage to the deceased had been a very mixed one in terms of gratification and frustration. The primary problems were brought on by the deceased's consistent infidelity over the years. Although appellant reproached the deceased concerning her behavior, he made no move to end their marriage. Four months prior to her death the deceased indicated that she was going to get a divorce. Appellant became extremely disturbed and increasingly unhappy at the thought of a divorce.
Dr. Brown stated that appellant gave him the following version of the shooting:
On the day of her death the deceased taunted appellant a great deal about seeing other men, living her own life and getting a divorce. Appellant felt hopeless and shot his wife with a .22 caliber pistol he had in his pocket. Immediately afterwards, he was overcome with terror and remorse and went to a neighbor to get help for the deceased.
Dr. Brown testified that there was no history of any relevant medical or psychiatric disorder in appellant's background. "Mr. Crumpton does not demonstrate any *Page 1085 
specific diagnosible mental disease. He does not have a mental disorder."
Dr. Brown explained that, psychologically, appellant viewed the deceased as a replica of his mother, and himself as the infant in their relationship. He stated that appellant made "a kind of unconscious treaty or pact" with the deceased. Dr. Brown said, "This pact being that I will stay with you forever regardless of what you do as long as you stay with me." Dr. Brown stated that the "pact" was working until the deceased, four months prior to her death, interjected a new element, the divorce, which ruined the balance of the equation. "This is tantamount in his unconscious to mother's leaving, which means death . . . he felt this whole process is really being tantamount to his own annihilation." Then, out of an unconscious belief that it is "better to do it yourself than to have it done to you," appellant shot the deceased.
At the conclusion of Dr. Brown's testimony, the defense rested its case.
 I
The State's evidence was sufficient to prove appellant's guilt beyond reasonable doubt. Section 13-1-70, Code of Alabama 1975. Although the evidence was conflicting in certain instances, any differences of fact were resolved by the jury. It is not the function of this court to re-weigh the evidence. We are required to review the evidence presented in the light most favorable to the State, Bass v. State, 55 Ala. App. 88,313 So.2d 208 (1975), and not to substitute our judgment for that of the jury, Cumbo v. State, Ala.Cr.App., 368 So.2d 871, cert. den., 368 So.2d 877 (Ala. 1979).
 II
Appellant maintains that the trial court committed reversible error when it gave the following statement of the law in its oral charge to the jury:
 "As you know, there is conflict of testimony in this case. Of course, you must determine which witness you will believe and which witness you will not believe. However, I will tell you that every person who comes into this or any other courtroom in this State, takes the oath and takes this stand, is presumed to speak the truth. It is your duty as the jury in this case to reconcile the testimony of all of the witnesses with that of being the truth if it is possible for you to do so. As the sole triers of the facts, however, if you are unable to do this then you and you alone must decide which witness you are to believe and which witness you are not to believe, and if you believe any witness has willfully sworn falsely to a material fact, as the sole triers of the facts in this case you may disregard any person's testimony who has sworn falsely to any material fact. The reason for this being simply the law would presume that if a person would testify falsely in any one material aspect the law would presume that person would testify falsely in any other material aspect.
So, like all of the other issues, you must determine which witness you are to believe and which witness you are not to believe.
 "In weighing the testimony of the witnesses who took the stand you may consider many things, the demeanor of the witness on the stand, that is, his ability to see and know the facts about which he has testified; the relationship which he bears to the party; their interest in the suit; the manner in which the witness may be affected by your verdict; and, of course, any bias or prejudice which any witness may possibly possess.
 "By way of a summary it has been said, and I think correctly so, that you are not required to leave your common sense outside of the jury room when you commence your deliberations. On the contrary, the law calls upon you 12 reasonable prudent men to use all of you combined wisdom, experience and common sense in sifting through the evidence, accepting the true and, of course, rejecting the false." (Emphasis added.)
Appellant excepted to this portion of the oral charge as follows: *Page 1086 
 "Next, Your Honor charged the jury that you may disregard any witness' testimony who has willfully sworn falsely to a material fact. The law presumes all of his testimony is false. We object to that in that law —
"THE COURT: I don't think I said that, Barry.
"MR. HESS: I may have written it down wrong —
"THE COURT: You did.
"MR. HESS. — but that's the way I understood it.
 "THE COURT: I said that the law presumes all witnesses speak the truth, but if any witness has sworn falsely to a material fact they may if they wish disregard that person's testimony. The theory of law being that if one would testify falsely in any one material aspect the law would presume he would testify falsely in any other material aspect, but go ahead.
 "MR. HESS: We submit that the law does not presume that, it merely permits the jury to draw that conclusion if they see fit and this is falsely telling them that the law in fact presumes it to be totally false."
Appellant contends that the oral charge was defective in two ways: first, that the falsus in uno, falsus in omnibus (false in one thing, false in everything) instruction, while stated correctly once, was stated incorrectly twice because the trial court failed to instruct that the false swearing must be "willful;" and second, that the maxim is not a mandatory legal presumption but merely a permissible aid which the jury may use in weighing the evidence.
Initially, we note that the trial court's oral charge must be considered and construed as a whole and in connection with the evidence, and if, when so construed, it asserts a correct proposition applicable to the evidence, a disconnected part or sentence is not reversible error. Van Antwerp v. State, Ala.Cr.App., 358 So.2d 782, cert. den., 358 So.2d 791 (Ala. 1978); Johnson v. State, 33 Ala. App. 159, 31 So.2d 667, cert. den., 249 Ala. 433, 31 So.2d 670 (1947).
An exception to the oral charge reaches only what the court did say, Grisham v. State, 147 Ala. 1, 41 So. 997 (1906). The objector or exceptor must select and recite, or state the substance of that part of the court's instruction to which the objection is made or the exception is taken. Knight v. State,273 Ala. 480, 142 So.2d 899 (1962); Walker v. State, 269 Ala. 555, 114 So.2d 402 (1959); Crear v. State, Ala.Cr.App.,376 So.2d 778, cert. den., 376 So.2d 788 (Ala. 1979); Oates v.State, Ala.Cr.App., 375 So.2d 1285 (1979). An exception to a charge must be specific and must quote the court's approximate language so that the trial judge will have an opportunity to correct the error, if any. Orr v. State, 40 Ala. App. 45,111 So.2d 627, aff'd, 269 Ala. 176, 111 So.2d 639 (1959).
An exception to a charge should set out the objectionable portion, and not merely refer to the charge on a particular subject. McGhee v. State, 178 Ala. 4, 59 So. 573 (1912);Shields v. State, 52 Ala. App. 690, 296 So.2d 786, cert. den.,292 Ala. 749, 296 So.2d 793 (1974). It is the accused's duty in excepting to separate the bad part from the good. Treadwell v.State, 168 Ala. 96, 53 So. 290 (1909). An exception merely describing the subject treated by the trial court in an oral charge is bad. Ex parte Cowart, 201 Ala. 55, 77 So. 349 (1917).
Based on the foregoing principles of law it is our opinion that appellant's exception did not adequately apprise the trial judge of the omission of the "willful" element of false swearing. In fact, in repeating the objectionable portion of the charge to the court, appellant stated that the trial judge "charged the jury that you may disregard any witness' testimony who has willfully sworn falsely to a material fact." (Emphasis added). Appellant's rephrasing, in which he recited what he thought he heard the trial judge charge, correctly states the very law appellant now complains was not stated. In other words, there was nothing in appellant's exception which alerted the trial judge to the omission of the word "willful" from the instruction. On the contrary, appellant's exception that the trial *Page 1087 
judge "charged" on willful false swearing did nothing more than reinforce to the judge that he had correctly charged the law on this point.
Thus, we hold that appellant's exception was insufficient to focus the trial judge's attention on any defect or misstatement in his instructions on willful false swearing, or to afford him an opportunity to make corrections on this matter. Exceptions to an oral charge cannot be made for the first time on appeal.Hall v. State, Ala.Cr.App., 375 So.2d 536 (1979).
Even assuming that appellant had properly excepted to the charge, and we hold that he did not, the trial court's instruction was not so defective as to require reversal. The trial judge did instruct that the false swearing must be done "willfully," Pinkerton v. State, 246 Ala. 540, 22 So.2d 113
(1945); Montgomery v. State, 17 Ala. App. 469, 86 So.2d 132, cert. den., 204 Ala. 389, 85 So. 785 (1920), although he did not repeat the word "willfully" each time in connection with the phrases "sworn falsely" or "testify falsely" in his charge. Taken in context with the court's entire charge on this subject, we do not find that appellant's substantial rights were injuriously affected.
Appellant did correctly except to that portion of the charge stating "the law would presume that if a person would testify falsely in any one material aspect the law would presume that person would testify falsely in any other material aspect." Appellant, as can be seen from the record, excepted to what "the law presumes." The trial court's attention was thus focused in a sufficient manner on the claimed defect in his oral charge.
Appellant is correct that a falsus in uno charge requiring, instead of permitting, the jury to disbelieve a witness is error. See Lowe v. State, 88 Ala. 8, 7 So. 97 (1889); Watson v.State, 19 Ala. App. 267, 97 So. 118 (1923); Butler v. State,16 Ala. App. 234, 77 So. 72 (1917). The charge must be phrased in permissive ("may disregard") rather than mandatory ("must disregard") terms. Lowe v. State, supra. See generally Annot. 4 A.L.R.2d 1077 (1949).
It is our judgment that the trial court's additional sentence by way of explanation, and its use of the word "presume," did not amount to a mandatory falsus in uno, falsus in omnibus
charge. The charge must be taken and construed as a whole, VanAntwerp v. State, supra. We note that immediately preceding the claimed objectionable portion of the charge, the court stated:
 "As the sole triers of the facts . . . you and you alone must decide which witness you are to believe. . . ."
Likewise, immediately following the part to which appellant excepted, the court stated:
 "So, like all of the other issues, you must determine which witness you are to believe and which witness your are not to believe."
When the foregoing statements are considered, along with the court's instruction that a willfully false swearing witness may
be disregarded, we believe the clear impact of the whole charge to be permissive rather than mandatory. Therefore, we find no reversible error.
 III
Next, the appellant complains that the trial court should have charged the jury on the law of mental disease or defect, a defense outlined in section 13A-3-1, Code of Alabama 1975, as amended.
The new Criminal Code, T. 13A, which includes section13A-3-1, applies only to offenses committed on or after its effective date. Section 13A-1-7, Code of Alabama 1975. All of title 13A, including section 13A-3-1, took effect on January 1, 1980. Acts of Alabama No. 79-125 (May 29, 1979), section13A-1-11, Code of Alabama 1975, as amended. The offense in the instant case occurred on January 9, 1979. Therefore, the law of mental disease or defect contained in section 13A-3-1, supra, has no application here.
We have examined the record and have found no error prejudicial to appellant. *Page 1088 
Therefore, the judgment of conviction by the Mobile Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.